[Civil No. 2892. Filed March 2, 1931.]

[296 Pac. 533.]

SOUTHERN PACIFIC COMPANY, a Corporation, Appellant, v. PIMA COUNTY, a Municipal Corporation of the State of Arizona, and J. W. BUCHANAN, Treasurer and *Ex-officio* Tax Collector of Pima County, Arizona, Appellees.

Messrs. Baker & Whitney and Mr. Francis M. Hartman, for Appellant.

Mr. Claude Smith, County Attorney, and Mr. W. G. Hall, Deputy County Attorney, for Appellees.

ROSS, J.—This is an action by the Southern Pacific Company against Pima county and J. W. Buchanan, treasurer and *ex-officio* tax collector of said county, to recover some school taxes paid to the treasurer under protest.

On June 5, 1928, common school district No. 1 of Tucson and high school district No. 1 of Tucson were by an order of the board of supervisors of Pima county enlarged to take in additional territory in which was included 2.7 miles of plaintiff's railroad. Prior to such annexation the districts' outstanding bonded indebtedness was the sum of $1,469,000 and their taxable property, as shown by the assessment for the year 1927, was valued at $27,911,350. The board of supervisors of Pima county, at the time of making the levy of taxes for county purposes for the year 1928, as provided by law, levied a tax upon the property of such school districts, including the 2.7 miles of railroad recently incorporated into the districts, to be applied on the above outstanding bonded indebtedness of the districts. Such taxes amounted to the sum of $1,435.38, and this action is to recover such sum.

The plaintiff's complaint after giving the facts, of which the above is a *résumé*, charges that the indebtedness of the districts, for the payment of which the taxes were assessed against its property, is in

excess of four per centum of the 1927 assessed valuation of taxable property of the districts, both before and after enlargement, and for that reason such assessment and levy upon the 2.7 miles of its railroad violates section 8 of article 9 of the state Constitution. It also charges that the 2.7 miles cannot be legally assessed for taxes to pay the outstanding indebtedness incurred by the old districts. It further charges that the assessment is invalid and illegal, particularly that made to apply on the outstanding bonded indebtedness of the high school district, for the reason that such high school district was never legally enlarged to take in the 2.7 miles of its railroad.

To this complaint defendants filed special and general demurrers. The general demurrer was sustained, and the plaintiff has appealed.

Plaintiff makes two assignments of error, but they are of the same import and embody the contention that the property included in the newly added territory cannot legally be taxed to pay any part of the indebtedness of the districts contracted before the annexation. This is the sole question before us.

If the annexed territory was, at the time of its inclusion in said school districts, in or a part of another district, this contention would probably have to be sustained. If, however, it was in what may be designated as unorganized territory for school purposes, a different rule would apply. This conclusion is based upon the language of paragraph 5272 of the Revised Statutes of Arizona 1913, Civil Code, in force at the time of the annexation. Such paragraph reads:

"No political subdivision or municipal corporation other than the subdivision or municipal corporation wherein the election shall be held as above prescribed, for the creation of any indebtedness herein provided for, shall in any manner be responsible for, or

charged with, the payment of any of the principal sum or interest thereon evidenced by such indebtedness."

The complaint does not allege that the annexed territory is, or ever had been, any part of an organized school district. This omission, it seems, should be taken and treated as an admission that the added territory was unorganized territory. That is an admitted fact.

We have no statute providing for a situation like the present, and, in determining whether the property in the annexed territory must contribute its proportion to the liquidation of the indebtedness of the districts, legally incurred before its inclusion therein, we must be governed by general principles and by the decisions of other courts, unless there be found in our Constitution a provision that takes care of the situation.

Plaintiff points to section 8, article 9, and section 13, article 7, of the state Constitution, as controlling. Section 8 limits the power of a county, city, town, school district and other municipal corporations to become indebted in any manner to an amount exceeding four per centum of its taxable property, without the assent of a majority of the property taxpayers, legally entitled to vote, voting at an election; but, if such majority gives its assent, a school district may become indebted to an amount not exceeding ten per centum of its taxable property, ascertained by the last assessment for state and county purposes previous to incurring such indebtedness. Plaintiff admits in its complaint and in its brief that the indebtedness of said school districts, towards the payment of which its property is assessed, is valid; that it was incurred by the districts in the manner provided by the Constitution and the law supplementary thereto.

Section 13, *supra*, provides that questions upon bond issues shall be submitted to a vote of the property taxpayers who are qualified electors of the political subdivision of the state affected by such question. It is not contended that said school districts did not conform their action in incurring the indebtedness with the provisions of this section of the Constitution. The assent to the districts' incurring the indebtedness of a majority of the property owners of the districts legally entitled to vote at the time being confessed or admitted, the question is, Must the property of only those who assented, or had the opportunity to assent, be taken to pay the indebtedness, or may the property of others later brought into the districts by annexation in the manner provided by law be also taken to pay the indebtedness?

Under the above provisions, the right and opportunity to vote on bond issues of a school district is limited to those legal voters who have property in the district at the time that will be subject to a tax to pay the bonds, and not those whose property is later by lawful methods incorporated into the district.

And the fact that plaintiff's property was annexed to the school districts without its consent is immaterial. Subject to such constitutional limitations as may exist, the power of the legislature over school districts is plenary. It may divide, enlarge, diminish or abolish them at pleasure. *Pass School Dist.* v. *Hollywood City School Dist.*, 156 Cal. 416, 20 Ann. Cas. 87, 26 L. R. A. (N. S.) 485, 105 Pac. 122; 1 Dillon on Municipal Corporations, p. 54; 24 R. C. L. 562, § 6.

There is no serious contention, at least the question is not presented by an assignment, that the change of the boundaries of the districts was not effected in the manner provided by paragraphs 2721 and 2722 of the Revised Statutes of Arizona 1913, Civil Code,

nor that such change was not lawfully made. In *Adriaansen* v. *Board of Education,* 222 App. Div. 320, 226 N. Y. Supp. 145, 149, the court, after stating " . . . it is conceded that there is no express provision of statute making the property in the annexed [school] districts subject to assessment for the payment of the bonds issued by old district No. 1 before the annexation of the other districts," said:

"We do not understand that an express provision of statute is necessary to accomplish that result.

"The law applicable to such a situation, as stated in many authorities, is that property in the territory annexed is liable to assessment for the payment of bonds and liabilities of the municipal corporation or district to which the territory is annexed. The authority of the Legislature over the boundaries of subdivisions of the state is absolute. It may consolidate, add to, or take from the territory of a municipality or district, without the consent of the municipality or district affected. By such action the rights of individuals in the territory affected are not violated. The fact that persons and property in the territory annexed may be subject to taxation to pay bonds and obligations theretofore voted, without their having had any voice or vote in creating the liability, does not render the act of annexation void. There is no contract between citizens of a particular municipality and the corporation that the property within the particular territory shall not be taxed for the benefit of another municipal corporation or district to which it may be annexed, even though the tax is assessed to raise money to pay bonds or obligations voted and incurred by the municipality or district before the annexation. 43 Corpus Juris, p. 143, § 122, reads:

" 'Debts of a municipality contracted before an annexation of territory become a burden upon the added territory as well as upon the original territory *in the absence of statutory provision to the contrary.'*

"See, also, section 123, same.

"Similar statements are contained in other textbooks. 20 Am. & Eng. Enc. of Law (2d ed.) 1152; 26 Cyc. 224; 19 Ruling Case Law, 732; Dillon on

Municipal Corporations (4th ed.), p. 268. Many cases are collated, in those authorities, sustaining the statements of the texts. There is also an exhaustive note to the case of *Blake* v. *Jacks,* 18 Idaho 70, 108 Pac. 534, 138 Am. St. Rep. 177, in 27 L. R. A. (N. S.) 1147, in which many cases are digested. Decisions by the courts of this state are to the same effect.''

Indeed, there seems to be no dissent from the above expression of the law. When, as here, neither legislation nor Constitution has provided that property in annexed territory to a municipality or school district shall be exempt from taxation to pay the corporate indebtedness incurred before annexation, the consensus of opinion seems to be that it is liable to the same extent as other property situate therein. Under the decisions, if it were not for paragraph 5272, *supra,* the newly incorporated territory, even though it had formerly been a part of another school district, would be subject to the tax. It is said in *Blake* v. *Jacks, supra:*

''Where it is not prohibited by statute, the natural and legal result of annexation of one portion of a county to another is that such annexed portion must pay its ratable share of the indebtedness of the county to which it is annexed.''

The limitation as to the amount a school district may become indebted and the method pursued in its incurring, as prescribed in the foregoing constitutional provision are not involved here. It is not necessary to determine whether that limitation of indebtedness therein provided includes debts both voluntarily incurred and those incurred by operation of law, as distinguished in *Lake County* v. *Rollins,* 130 U. S. 662, 32 L. Ed. 1060, 9 Sup. Ct. Rep. 651, and in *People* v. *May,* 9 Colo. 404, 12 Pac. 838, where the validity of the indebtedness itself was in question. The debts here incurred before the annexation are unquestionably valid. While those property owners

in a school district who are also legal voters therein are entitled to an opportunity to give or withhold their assent to the incurring of a bonded debt at an election on the question, the constitutional provisions above do not give the right to vote thereon to owners of property that later becomes by operation of law a part of the districts. In other words, there is no provision in our Constitution or statutes requiring that property owners must in all cases give their consent to a tax levy before it is legal. Except where restrained by the Constitution, the legislature's power over taxation is plenary, just as it is over the enlarging, diminishing, or abolishing of school districts.

Plaintiff states in its brief that Texas, under a provision of its Constitution ''almost identical with ours . . . and framed for the same purpose,'' has held that the owners of property in annexed territory are not taxable to pay debts of a school district contracted before the annexation. The case relied upon in support of this statement is *Crabb* v. *Celeste Independent School Dist.*, 105 Tex. 194, Ann. Cas. 1915B 1146, 39 L. R. A. (N. S.) 601, 146 S. W. 528. Section 3, article 7, of the Constitution of Texas, after providing for a continuing tax and appropriation for each public free school in the state, in an amount sufficient to maintain and support it for not less than six months each year, states that ''the legislature . . . may authorize an additional annual *ad valorem* tax to be levied and collected within such school districts for the further maintenance of public free schools and the erection of school buildings therein; provided, that two-thirds of the qualified property taxpaying voters of the district, voting at an election to be held for that purpose, shall vote such tax, not to exceed in any one year twenty cents on the one hundred dollars valuation of the property subject to taxation in such district. . . . ''

Now let us apply the facts to this provision of the Constitution. Several years prior to 1907 the property tax-paying voters of Celeste school district voted a tax of twenty cents on the one hundred dollars valuation of the property subject to taxation therein, and had thereafter annually collected such tax for the support of its schools. In May of 1907 new and additional territory was annexed to the district. · The question was whether a tax could be collected from the property owners in the added territory under the levy made some years before the annexation, or was it essential to a valid levy that it be made subsequent to the annexation. The court held, and very properly, that under the terms of the Constitution the tax-levying body of the district was the property tax-paying voters of the district and that taxpayers of the district as enlarged should have been given an opportunity to vote thereon. It will be noted that the above constitutional provision requires that the tax be voted by ''two-thirds of the qualified property tax-paying voters'' of the district, and that it is an annual tax to be fixed by those who pay it, or at least two-thirds of them, all having an opportunity to vote. The levying body are those taxpayers who are required to pay the current annual tax, and not just that portion of them who belonged in the district before its enlargement. As is said by the learned justice who wrote the opinion:

''It is an accepted rule of construction that, where a power is expressly given by the Constitution, and the mode of its exercise is prescribed, such mode is exclusive of all others.''

We have held that an assessment must be made by the officer designated by the law or it will be void. *Southern Pac. Co.* v. *Graham County,* 36 Ariz. 359, 285 Pac. 998. It can easily be seen that there is no

analogy between the facts and the law in the Crabb case and the facts and law in the present case.

Cases involving fact situations the same as we have here were urged upon the court in the Crabb case by the school district to sustain its contention that the levy upon the property in the annexed territory was legal, and the court took the trouble to examine them all, and pointed out the constitutional and legal principles that distinguished them from the case in hand. One of such cases was from that state. It is *Madry* v. *Cox,* 73 Tex. 538, 11 S. W. 541, and it involved the same question we have. It was whether or not property within annexed territory was subject to taxation for a debt previously incurred by a vote of the people of the city of Bonham, to which such territory had been added. The court, after quoting from the Madry opinion, as follows:

" 'When this is done, the indebtedness of the corporation continues; and persons within territory annexed will become, in the absence of legislation to the contrary, subject to taxation for all municipal indebtedness existing before annexation, as well as that afterwards contracted' "—

said:

"This has ever been the law in this state, and, so far as we know, in all other jurisdictions, where there is an absence of legislation controlling the subject; but in what respect it throws light upon the question we are considering we are not able to determine. If, at the time a debt is created by a vote of the people of a city, a tax is likewise voted to pay the interest and create a sinking fund to pay such indebtedness, pursuant to some constitutional provision, a parallel case would be presented, and in such case we would not hesitate to rule the tax void as to property embraced in the subsequent extension of such city. In that case, a debt was created by a vote of the people; but the tax was levied by the municipality, and not by the property owners."

Another case is *White et al.* v. *City of Atlanta,* 134 Ga. 532, 68 S. E. 103, wherein that court, in speaking of the duty of newly added territory to the city, said:

"When included within the city by legislative enactment, they take the advantages of being residents or taxpayers of the municipality, and they become subject to the corresponding proportionate burden, in the absence of lawful provision to the contrary."

If plaintiff's contention should be sustained, it would produce unjust, not to say unreasonable results. The residents of the annexed territory would be and remain in said school districts No. 1 of Tucson, and those of school age would be entitled to attend its free schools, with the same privileges as the children of those who had pledged their property to pay the bonds, the proceeds of which were used to build the schoolhouses. They would receive the benefits accruing to the districts by reason of the bond issue and enjoy the school facilities acquired by the districts with the bonds without paying a cent on any of the districts' improvements made before such districts were enlarged. It is but common justice that the owners of property in the annexed territory should share the burdens of the districts legally assumed before the annexation, since they reap the benefits thereof.

Educational benefits are not the only accretions from a fine system of public free schools in Tucson. In proportion as the standard of its schools is raised, its attractiveness as a playground and winter resort will be enhanced, so that even a transcontinental transportation line like plaintiff's may be expected to benefit from an increase in traffic.

We are satisfied that the plaintiff's contentions are not justified under the above constitutional provisions or any law of the state.

The complaint fails to state a cause of action, and the demurrer was properly sustained.

The judgment is affirmed.

McALISTER, C. J., concurs.

LOCKWOOD, J., Dissenting.—I regret to say I cannot concur in the opinion of the majority of the court. That opinion, carried to its logical conclusion, seems to me of such vital and far-reaching effect that, although I realize my protest can have no legal value, I feel I cannot by silence appear to approve of what seems to me a narrow and logically unsound interpretation of one of the most important provisions of our Constitution. It affects only a small amount of property of a large corporation to-day, but to-morrow the rule laid down may encumber the homes of hundreds without their consent.

There is in effect but one question raised by this appeal, and that is whether territory included within a school district by action of the board of supervisors, without the assent, express or implied, of the qualified electors and property taxpayers of such included territory, is subject, *ipso facto,* to an indebtedness previously legally incurred by the original district, when such indebtedness exceeds four per cent of the value of the district as enlarged.

As is stated in the plaintiff's brief, "the gravamen of this action is not the power of the Board of Supervisors of Pima County to enlarge a school district, but it is the question of the power of the Board to impose upon the new territory the pre-existing indebtedness of the old district." It is contended that such imposition violates the provisions of section 8, article 9, and section 13, article 7, of the Constitution of Arizona, which read, respectively, as follows:

"Section 8. No county, city, town, school district, or other municipal corporation shall for any purpose

become indebted in any manner to an amount exceeding four per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of a majority of the property tax-payers, who must also in all respects be qualified electors, therein voting at an election provided by law to be held for that purpose, the value of the taxable property therein to be ascertained by the last assessment for State ·and county purposes, previous to incurring such indebtedness. . . . ''

''Section 13. Questions upon bond issues or special assessments shall be submitted to the vote of property tax payers, who shall also in all respects be qualified electors of the State, and of the political subdivision thereof affected by such question.''

The position of plaintiff is that no indebtedness in excess of the four per cent limit can in any manner whatever be imposed upon the territory within a school district unless the owners of such territory, who are also qualified electors of the district as it exists at the time such indebtedness becomes a liability on the specific land involved, have been given an opportunity to vote upon the question of whether such indebtedness shall be incurred.

The matter is one of more than passing importance, affecting not merely the situation existing in the case at bar, but many others analogous thereto which have arisen or may arise in the future. The first question which we should determine is whether the inhibition of section 8, *supra*, applies only to indebtedness incurred by the voluntary act of the municipal corporation affected, or whether it includes indebtedness of every character, no matter how imposed. The Supreme Court of California has had this question before it repeatedly, under a constitutional provision (article 11, § 18) that ''no county, city, town, township, board of education, or school district shall *incur* any indebtedness or liability in any manner or for any purpose . . . , '' and it has held consistently that the word

"incur" implies a voluntary act on the part of the municipal corporation concerned, and does not refer to an indebtedness arising from an act of the legislature. *People* v. *San Bernardino High School Dist.*, 62 Cal. App. 67, 216 Pac. 959; *Lewis* v. *Widber,* 99 Cal. 412, 33 Pac. 1128; *Welch* v. *Strother,* 74 Cal. 413, 16 Pac. 22; *Federal Const. Co.* v. *Wold,* 30 Cal. App. 360, 158 Pac. 340.

The Supreme Court of Colorado, on the other hand, construing a constitutional provision that "the aggregate amount of indebtedness of any county for all purposes . . . *shall not at any time exceed"* a certain amount, held the limitation was not only on the voluntary act of the municipal corporation affected, but upon legislative action as well. *People* v. *May,* 9 Colo. 404, 12 Pac. 838.

The same constitutional provision was before the Supreme Court of the United States in the case of *Lake County* v. *Rollins,* 130 U. S. 662, 32 L. Ed. 1060, 9 Sup. Ct. Rep. 651, and it was therein held that under the Colorado Constitution the legislature could not impose a debt upon a county, nor could the county voluntarily assume it against the Constitution's prohibition.

What is the meaning of our Constitution? The exact language is "No . . . municipal corporation shall *for any purpose become indebted in any manner."* Constitutional provisions obviously intended for protection of the life, liberty, or property of the citizen should be liberally construed in favor of the citizen. *State* v. *Birmingham S. R. Co.,* 182 Ala. 475, Ann. Cas. 1915D 436, 62 South. 77; *Boyd* v. *United States,* 116 U. S. 616, 29 L. Ed. 746, 6 Sup. Ct. Rep. 524; *Salter* v. *State,* 2 Okl. Cr. 464, 139 Am. St. Rep. 935, 25 L. R. A. (N. S.) 60, 102 Pac. 719. And it is plain this section was meant to protect the citizens of any municipal corporation against an indebtedness in ex-

cess of a certain amount "for any purpose" or "in any manner," without their consent.

It seems to me, therefore, that the language "become indebted in any manner" implies the result, as held by the Supreme Courts of the United States and Colorado, rather than the manner of arriving at the result, as held by the Supreme Court of California. This view is borne out by the general provisions of the Arizona Constitution. Section 5, article 9, prohibits the state itself from incurring indebtedness except to a very limited amount, and for certain special purposes, and this undoubtedly applies to legislative action. If the Constitution thus limits the power of the legislature as to indebtedness in regard to a matter peculiarly within its province, it is but reasonable to assume a similar intent as to matters usually left to the various localities affected, and that section 8, *supra,* was meant to protect the taxpayers of the different subdivisions of the state, not merely against their own action, but against that of the legislature as well.

I am of the opinion, therefore, that section 8, *supra,* applies to any indebtedness, no matter how incurred, whether by voluntary act of the municipal corporation, or through the legislature. And, if it be beyond the power of the legislature to impose a direct debt upon a municipal corporation, I think it is equally logical that what may not be done directly may not be done indirectly. I believe, therefore, that no act of the legislature can, either directly or impliedly, impose an indebtedness on the school district in question, if such debt is in excess of the four per cent limit set forth in section 8, *supra,* and that such debt only becomes valid through "the assent of a majority of the property taxpayers, who must also in all respects be qualified electors, therein voting at an election provided by law to be held for that purpose."

It is urged by defendants, however, that the indebtedness in question was approved by the taxpayers in the manner provided by section 8, *supra*, that it was a debt of school district No. 1 of Pima county, and that, since the legal entity of the district is unchanged, even though the area is different, all the property within the enlarged boundaries is subject to the debt. That the legislature itself intended to impose a different rule, and to relieve newly annexed territory from the burden of a debt incurred without the consent of the property owners in such new territory, is at least a reasonable contention. Paragraph 5272, Revised Statutes of Arizona, Civil Code 1913, in force at the time of the annexation, reads as follows:

"No political subdivision or municipal corporation other than the subdivision or municipal corporation wherein the election shall be held as above prescribed, for the creation of any indebtedness herein provided for, shall in any manner be responsible for, or charged with, the payment of any of the principal sum or interest thereon evidenced by such indebtedness."

While it is true the majority of this court hold this applies only to the annexation of territory already a part of some organized school district, and if we adopt a literal interpretation of the statute this is perhaps true, the immediately preceding paragraphs of the Code show clearly that the principle on which paragraph 5272, *supra,* is based is that no indebtedness should be imposed on real property without the consent of the owner. And, if this be true when the property is in an organized district, every principle of justice would require that the owners of property in unorganized territory be given equal protection.

Be that as it may, however, the real objection is not statutory, but constitutional, and the question is whether the constitutional provision limits the debt to the district as it existed at the time of the election, or extends it to the new area included in the district

as it may afterwards be enlarged by law. I have examined carefully the authorities cited by counsel and the majority opinion, and have also investigated the Constitutions of every state in the Union having a provision in any manner resembling ours to determine whether such provisions have been construed on this point by the appellate courts of the respective states involved. I have found but two cases which appear to be even remotely in point. The Constitution of Georgia contains a clause which reads, so far as applicable to this matter:

"The debt hereafter incurred by any county, municipal corporation, or political division of this State . . . shall not exceed seven per centum of the assessed value of all the taxable property therein, and no such county, municipality, or division shall incur any new debt . . . without the assent of two thirds of the qualified voters thereof at an election for that purpose. . . . " Article 7, § 7, par. 1, Constitution of Georgia.

The Supreme Court of Georgia in the case of *White* v. *City of Atlanta,* 134 Ga. 532, 68 S. E. 103, had before it the precise question involved herein. In that case it said:

"The Legislature has the power to extend the corporate limits of a city. In doing so they may provide for the holding of an election to determine whether or not the extension shall be made, but they are not compelled to do so. Beyond the publication required by the constitution to be made before the introduction or passage of a local act, there is no requirement for giving notice or obtaining the consent of persons residing in the unincorporated territory which is to be added to the city. When included within the city by legislative enactment, they take the advantages of being residents or taxpayers of the municipality, and they become subject to the corresponding proportionate burden, in the absence of lawful provision to the contrary. Receiving such benefits as may arise to residents of a city in connection with police protec-

tion, lighting, water, sewers, or the like, there is no injustice in requiring that they should share with other residents or taxpayers of the city in proportionately carrying the municipal burdens. Nor is it in violation of the constitutional provisions against the incurring of debts by counties or municipalities except by an election held for that purpose that the new residents become an integral part of the municipality, and as such may be subject to taxation to assist in paying debts already incurred. By way of illustration, suppose a system of waterworks had been established by means of the issuance of bonds, and residents of the added district were allowed, as the pipes could be extended, to make water connections therefrom to their property, certainly they ought not to be allowed to receive the benefits of the established system without assisting in the discharge of the burden entailed by it. To endeavor to keep separate accounts for different portions of a city might create great confusion. While to a certain extent the Legislature may make distinctive provisions legitimate in connection with adding the new territory to the city, an effort to make permanent discriminatory provisions as to different parts of a municipality would be more likely to raise constitutional questions than to allay them. We need not discuss the extent to which the Legislature may go in that direction. What we now hold is that the inhabitants in the newly added territory have not raised any valid constitutional objection to the act on the ground that the new inhabitants of the city and their property will be proportionately subject to taxation to meet the liabilities already existing [citing cases]."

The state of Texas has the following constitutional provision:

"And the legislature may also provide for the formation of school districts within all or any of the counties of this state, by general or special law, without the local notice required in other cases of special legislation, and may authorize an additional annual *ad valorem* tax to be levied and collected within such school districts for the further maintenance of public

free schools and the erection of school buildings therein; provided, that two-thirds of the qualified property tax paying voters of the district, voting at an election to be held for that purpose, shall vote such tax. . . . " Article 7, § 3, Constitution of Texas.

A certain school district was organized under the constitutional provision above quoted. The property tax-paying voters of this particular district voted an *ad valorem* tax, and for some years had annually levied and collected such tax for the support of the school district. Some time thereafter certain new and additional territory was annexed to the district. An attempt was made to collect the special tax voted as above without resubmitting the question to the voters of the annexed property, and the plaintiffs, who were property holders within the additional territory, brought suit to enjoin its collection. The Supreme Court of Texas, in the case of *Crabb* v. *Celeste Independent School Dist.*, 105 Tex. 194, Ann. Cas. 1915B 1146, 39 L. R. A. (N. S.) 601, 146 S. W. 528, stated:

"By the terms of section 3, article 7, of the Constitution, above quoted, the power is given independent school districts to levy and collect a tax of 20 cents on the $100 valuation of all the property subject to taxation situated within its limits; and the mode of levying and collecting such tax is limited to a vote of two-thirds of the qualified property tax-paying voters of the district, voting at an election held for that purpose. The mode thus prescribed excludes all others; and it may be said that, not only is no authority conferred by the Constitution to otherwise levy and collect such special tax, but that any other method of so doing is positively prohibited. Making a practical application of this rule, where an independent school district is incorporated with a fixed area, and as thus formed votes the tax, and afterwards takes in additional territory and levies a tax on the property in such territory, it seeks in effect to collect a special tax *by the method of territorial extension.* This is

clearly in violation of the Constitution; and hence cannot be done. The language of the Constitution is clear that independent school districts are permitted to levy the tax of 20 cents on the $100 valuation of property within its limits by submitting the proposition to the qualified taxpaying voters of such district, and then only upon a vote of two-thirds of such qualified voters. If the tax may be levied and collected on the property subject to taxation within the new territory without submitting the proposition to a vote of the qualified tax-paying voters of the district as altered and enlarged, then that which may not be done directly may be done indirectly. This is true, for the reason that, under the law, additional territory may be taken in by the independent school district by a petition, signed by a bare majority of the inhabitants of such new territory qualified to vote for members of the Legislature. Sayles' Supp. to Texas Civ. Stat. 1906, p. 441.'' (Italics ours.)

The court then proceeded to review the various cases cited by counsel for defendant; among them being that of *White* v. *Atlanta, supra,* and *Madry* v. *Cox,* 73 Tex. 538, 11 S. W. 541. It further points out clearly the difference between a statutory and a constitutional provision, stating:

''If we had no constitutional provision to grapple with, we would be constrained to hold that, where the legislative act gave the property owner the right to participate in the proceeding to determine whether or not the tax should be levied, another legislative act, authorizing an extension of the district where the tax had been voted, would subject the property within the extension subject to the tax, notwithstanding the nonparticipation of the property owner in the levy of the tax. This, however, is not the status of the case at bar; for here the right to participate in the levy of the tax is given the resident property owner by the Constitution, and the Legislature is denied authority to abridge that right. Where there is no constitutional inhibition, the power of the Legislature to enact laws is supreme and unlimited. *But when*

*the Constitution speaks, either by direction, negation, or necessary implication, its voice must be heeded even by the sovereign power of the legislative branch of government."* (Italics ours.)

This case has been consistently and repeatedly followed in Texas ever since its decision. The cases cited by defendants as being exceptions thereto are clearly on their faces not in point. That of *Madry et al.* v. *Cox, supra,* relied on in the majority opinion, is not in point, for nowhere in the Constitution of Texas at that date was there any limitation on the amount of indebtedness of a municipal corporation, or the manner of incurring such debt, and it is unquestioned that *in the absence of constitutional limitation* the legislature may annex territory and impose indebtedness at will. But, in discussing the Madry case, the Supreme Court of Texas said in the Crabb case: "If, at the time a debt is created by a vote of the people of a city, a tax is likewise voted to pay the interest and create a sinking fund to pay such indebtedness, *pursuant to some constitutional provision,* a parallel case would be presented, and in such case we would not hesitate to rule the tax void as to property embraced in the subsequent extension of such city" (italics ours)—clearly indicating that, if the debt as well as the tax had been subject to the constitutional limitation, it would not have covered property subsequently annexed. It seems to me the majority of the court has failed to appreciate fully the difference between the power of the legislature in the absence and in the presence of constitutional restrictions on this point. I am of the opinion the reasoning in the Texas case is more logical than in that from Georgia. The whole argument of the Supreme Court of Georgia is apparently based on the theory that, when a community receives benefits, even though thrust on it against its will, it is bound, equitably speaking, to help pay for them. The chief grievance

which led to the foundation of the American republic was the imposition of taxes without the right of the taxpayers to be heard on the issue. The English crown argued, as did the Supreme Court of Georgia, that the colonies received the benefits of the taxes imposed by Parliament, and therefore had no legitimate grievance because they had no voice in their imposition. But the stern arbitrament of war determined that "taxation without representation" was indeed tyranny. From time immemorial, the right of the taxpayer to be heard before he was burdened by taxes has been most jealously guarded by all English speaking peoples, and I believe that, when the interpretation of a constitutional provision, which on its face is meant to protect this right, is concerned, a proper construction of its spirit extends its protection not merely to the original territory of a taxing unit, but to territory subsequently added thereto.

I think, therefore, that debts incurred by the vote of the taxpayers under the provisions of section 8, *supra,* are limited in their effect to the territorial area of the political subdivision as it exists at the time the indebtedness is submitted, and that they cannot be extended to cover an area which did not have an opportunity to be heard on the original question, except by a resubmission of the issue. Were the inhabitants of the annexed territory given an opportunity to be heard on the question of annexation, it might perhaps be argued they were estopped from claiming a burden was imposed upon them without their consent, but under our law annexations are made by the board of supervisors without being submitted to the voters of the new territory.

For the foregoing reasons the judgment of the superior court should be reversed, and the case remanded, with instructions to overrule the demurrer to the amended complaint, and for other proceedings not inconsistent with this opinion.